Paul NASH, Plaintiff, Appellant,

v.

**TRUSTEES OF BOSTON UNIVERSITY, Defendant, Appellee.**

No. 90–1728.

United States Court of Appeals, First Circuit.

Heard Dec. 4, 1990.

Decided Oct. 15, 1991.

---

appeals the dismissal of his complaint for breach of contract and for violation of the Employee Retirement Income Security Act ("ERISA"). The district court determined that since Nash fraudulently induced BU to enter into their so-called early retirement agreement (otherwise: "agreement") the agreement is subject to rescission and, assumedly, the ERISA claim is mooted.

## I

### FACTS

Nash chaired BU's Department of Humanistic Education and Human Services ("HEHS"). On August 1, 1984, BU notified Nash that it intended to discontinue the HEHS program. As required by the collective bargaining agreement ("CBA"), the notice indicated that BU would make every effort to reassign Nash to a suitable position, with the same rank and salary, but that he would be discharged if no such position were available. After obtaining an offer of employment from the Rhode Island School of Design ("RISD"), Nash initiated a series of meetings with BU officials.

At the first meeting, on August 8, Nash met with BU President John Silber and expressed concern as to whether he would be retained as a faculty member. Nash testified that he told Silber about the RISD offer and that he was being urged to make a decision. Silber categorically denied that Nash ever told him about the RISD offer.

Prior to the next meeting, held on August 13 with BU Provost Jon Westling, Nash prepared a document indicating that he "was seeking, despite the termination of the program in [HEHS], to continue to teach at [BU] as a tenured professor." The document listed various departments in which Nash considered himself "competent and willing" to serve as a member of the BU faculty. At the August 13 meeting, Nash informed Westling that he had received a job offer from RISD.

On August 14, during a meeting with Joseph Meng, BU Vice President for External Programs, Nash for the first time mentioned early retirement, and the process was explained to him. At an August 27

Steven E. Snow with whom Partridge, Snow & Hahn, Providence, R.I., were on brief, for plaintiff-appellant.

Dennis C. Hart with whom Office of the General Counsel, Boston University, Boston, Mass., was on brief, for defendant, appellee.

Before BREYER, Chief Judge, CAMPBELL and CYR, Circuit Judges.

CYR, Circuit Judge.

Paul Nash, formerly a tenured professor at Boston University (otherwise: "BU"),

meeting with Westling and Meng, Nash presented a written proposal for early retirement.[1] Meng testified that Nash was asked specifically "about the job at [RISD]," and that Nash responded, "That's out of the question; I kept them waiting too long; they are talking to another candidate." Westling confirmed that Nash stated that he had let the RISD position pass. Nash denied any discussion of the RISD job at the August 27 meeting.

According to Meng, Nash was informed at the August 27 meeting that his employment at BU was secure, but expressed no interest in remaining, stating instead "that he wanted to retire from [BU], do consulting and writing and was now just absolutely interested in an early retirement deal." Although Nash contradicted Meng's testimony, it is not disputed that by August 27 Nash had given RISD his oral acceptance. On August 31, one day after Nash formally accepted the RISD position, Meng told Nash that "his job was secure after the termination of the HEHS program so he need not feel pressured into seeking early retirement." Nash did not tell Meng that he had accepted the RISD position.

On September 10, almost two weeks after his written acceptance of the RISD position, Nash and BU executed the early

retirement agreement now in litigation. The agreement entitled Nash to a lump-sum payment of $88,230, the office of Professor Emeritus, and the right to arrange for an adjunct teaching position in the School of Education with compensation over and above the lump-sum payment provided under the agreement. Nash agreed to surrender all tenure rights, waive all claims against BU, and to serve as an advisor to HEHS students for the next two years.

The district court found BU's version of these events "infinitely logical." The court concluded that "Meng would never have negotiated an early retirement agreement if he knew Nash had secured for himself a job at RISD." As the court concluded that Nash's credibility had been undermined by several falsehoods,[2] it rejected Nash's version of the events as "inconceivable."

## II

## DISCUSSION

### Sufficiency of Evidence of Fraud

 In order to make out a claim of fraud in the inducement under Massachusetts law, BU was required to establish a false representation material to the negoti-

---

1. Prior to the August 27 meeting, Meng and Westling agreed that "it was important that we ask Professor Nash where [his negotiations with RISD] stood because if he was still a candidate, then we should postpone negotiations for an early retirement to see what would actually in the end transpire."

2. For example, Nash sent the following letter to the Dean of the BU School of Education, on August 27, following Nash's oral acceptance of the RISD position:

 I have been offered positions at two other institutions, but have kept them waiting beyond the limit of their needs, so they are now negotiating with other candidates. However, the process of considering them, and the Boston University negotiations, have made me ready for a more radical change in my life. I am ready to try to make it on my own, with some writing and perhaps consulting to sustain me.
 Additionally, Meng testified that Nash indicated in a September 6 telephone conversation that he "had agreed to assist on a part-time consulting basis in the Office of the Vice Presi-

dent for Academic Affairs at RISD until the individual who had been recruited for that position assumed the job on a full-time basis." Although Nash denied having said anything about another candidate starting in the job, Nash admitted "I did tell him at that time that my appointment at RISD was two days a week rather than full-time. That much is true." As the district court noted, Nash thereby admitted to a knowing misrepresentation. In advance of this telephone conversation, Nash already had begun his full-time, permanent position with RISD.
 Finally, during September, Nash wrote a series of letters to BU officials in which he repeated the misrepresentation that he had passed up the RISD position. Nash described these letters as "bread and butter" letters, explaining that "in a bread and butter letter what you do is you thank the hostess or host for the tea but if the cake was stale, you might add a little jab to tell them that the cake was stale and Mr. Silber's cake was stale and Mr. Westling's cake was stale." The district court found the "bread and butter" letters "rather rancid and sour," and concluded that Nash's "testimony destroyed his own credibility."

ations, upon which BU reasonably relied in entering into the agreement. *See Turner v. Johnson & Johnson,* 809 F.2d 90, 95 (1st Cir.1986). Nash disputes the sufficiency of the evidence establishing each of these elements, *except* the false representation element. We review the district court's findings of fact for clear error, *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 541–42, 92 L.Ed. 746 (1948); *Chamberlin v. 101 Realty, Inc.,* 915 F.2d 777, 781 (1st Cir.1990); *see* Fed. R.Civ.P. 52(a), and find none.

According to Nash, BU entered into the agreement not because it was unaware of his employment by RISD but because BU feared he might prevail on a wrongful termination claim under the arbitration clause in the CBA. Nash points out that BU entered into early retirement agreements with other HEHS faculty members and that Meng testified that the purpose behind those agreements was to "obtain their release and waiver of claims that their termination was illegal and that the termination of the HEHS program violated the terms of the collective bargaining agreement." Nash further contends that, as the HEHS program director, he was in a far better position to challenge its termination than were his colleagues.

Nash's contention is predicated entirely on the assertion that he was wrongfully terminated. The district court found, however, that he was *not terminated* by BU but that he was expressly told that he was free to remain on the BU faculty. The record strongly supports the finding that Nash *rejected* BU's invitation to remain as a full-time BU faculty member, because he preferred to pursue the early retirement agreement.[3] Moreover, the record is devoid of evidence that a waiver of any potential legal claim for wrongful termination was ever a point of contention, or even of discussion, in Nash's negotiations with BU.[4] Conversely, several BU officials testified that Nash's alternative employment opportunities were broached in virtually every communication between the parties during the relevant period. Finally, ample evidence supported the district court finding that BU would not have entered into the agreement had Nash not concealed his newfound RISD employment.[5]

The district court findings were not clearly erroneous.

*ERISA Claims*

The district court concluded that Nash's fraudulent inducement of the agreement obviated the need to consider the ERISA claims predicated on the agreement. Nash contends that the district court erred,[6] in that the agreement is an employee benefit plan[7] under ERISA and that his rights

3. Nash claims that BU employed a "deliberate and calculated plan" to fraudulently induce Nash to seek and obtain other employment. The crux of the alleged plan was the August 1 letter from BU, advising of the HEHS program termination and that "[a]s provided in the collective bargaining agreement, the University [would] make every effort to reassign [Nash] to another suitable position within the University at the same rank and salary. Should such a position not be available, however, [Nash's] current position [would] be discontinued and [his] employment at Boston University [would] end on August 31, 1985." As the district court determined, however, the letter was sent pursuant to the notification requirement in the CBA, and, in any event, Nash had made job overtures to RISD fully six months before he received the August 1 letter from BU.

4. Although a waiver provision was included in the agreement, Meng explained its inclusion as "routine."

5. For example, BU President Silber testified that "under no circumstances would we offer an early retirement agreement [to a] person who had, prior to negotiating that agreement, already accepted a job at another institution." Vice President Meng similarly stated that "the early retirement agreements are incentives to get people to retire. If I knew [Nash] had this job ... I would have no incentive to get him to resign."

6. Specifically, Nash asserts that BU breached its fiduciary duty in respect of his putative ERISA benefit plan when it purportedly rescinded the agreement. *See* 29 U.S.C. § 1109. In addition, he seeks recovery of benefits under the plan. *See* 29 U.S.C. § 1132(a)(1)(B).

7. Under ERISA's statutory scheme, ERISA claimants must establish, as a prerequisite to jurisdiction, that their agreement is a "plan." 29 U.S.C. §§ 1132(a)(1)(B) & (e). The term "plan" means either an "employee welfare benefit plan" or an "employee pension benefit plan." 29 U.S.C. § 1002(3).

under the plan are therefore "nonforfeitable." 29 U.S.C. § 1053(a). Accordingly, in addition to attorney fees, Nash seeks "full restitution" under the agreement, notwithstanding the finding of fraud in its inducement.

Thus, the threshold hurdle Nash encounters is the district court ruling that BU's successful affirmative defense of fraud in the inducement of the early retirement agreement precluded his ERISA claims. For present purposes we assume, *arguendo*, that an agreement of the type executed by BU and Nash would constitute an "employee benefit plan" under ERISA. We likewise assume, again without deciding, that state law contract principles are preempted under ERISA.[8]

ERISA contains no body of contract principles informing the interpretation and enforcement of employee benefit plans. *Scott v. Gulf Oil Corp.*, 754 F.2d 1499, 1501–02 (9th Cir.1985) (acknowledging absence of contract principles); *Rockney v. Blohorn*, 877 F.2d 637, 643 (8th Cir.1989) (same). Congress intended instead "that a federal common law of rights and obligations under ERISA-regulated plans would develop." *Pilot Life*, 481 U.S. at 56, 107 S.Ct. at 1558. *Kwatcher v. Massachusetts Service Employees Pension Fund*, 879 F.2d 957, 966 (1st Cir.1989); *Burnham v. Guardian Life Ins. Co.*, 873 F.2d 486, 489 (1st Cir.1989).

The ERISA claim presented by Nash depends on whether the body of federal common law contract principles Congress left to judicial development permissibly encompasses the affirmative defense of fraud in the inducement of the alleged ERISA plan. *Equicor–Equitable HCA Corp.*, 944 F.2d 1272 (6th Cir.1991) (ERISA preempts breach of contract, promissory estoppel, negligence and breach of good faith); *Davidian v. Southern California Meat Cutters Union & Food Employees Benefit Fund*, 859 F.2d 134 (9th Cir.1988) (breach of fiduciary duty, bad faith, fraud, and deceit); *Reilly v. Blue Cross & Blue Shield United of Wisconsin*, 846 F.2d 416 (7th Cir.1988) (breach of fiduciary duty, fraud, conspiracy, bad faith); *Hermann Hospital v. MEBA Medical & Benefits Plan*, 845 F.2d 1286 (5th Cir.1988) (equitable estoppel, negligence, breach of contract, fraud, and breach of fiduciary duty).

No court, to our knowledge, has as yet considered whether ERISA preempts a state law defense of fraud in the inducement relating to the *formation* of the putative ERISA plan. Notwithstanding our contrary assumption, however, we observe that Nash's preemption claim under 29 U.S.C. § 1144(a) is a precarious one. ERISA states that, generally speaking, its provisions "shall supersede any and all State laws insofar as they may now or hereafter relate to *any employee benefit plan*." 29 U.S.C. § 1144(a) (emphasis added). Thus, section 1144(a) reasonably bears the interpretation that ERISA supersedes all state laws relating "to any employee benefit plan," but not state law contract principles whose violation would preclude the *formation* of any valid contract in the first instance. In other words, section 1144(a) supersedes state law provisions sought to be applied to a putative ERISA benefit plan, except insofar as its *formation* failed to satisfy the generally applicable contract principles prerequisite to the creation of any agreement. As no agreement of any kind would exist to which ERISA could be considered applicable, the § 1144(a) preemption would not be activated.

---

An "employee welfare benefit plan" includes, *inter alia*, "any benefit described in section 186(c) of this title." 29 U.S.C. § 1002(1)(B). Thus, a Labor Department regulation promulgated under ERISA states: "the effect of [§ 1002(1)(B) ] ... is to include within the definition of 'welfare plan' those plans which provide ... *severance* benefits." 29 C.F.R. § 2510.3–1 (emphasis added). An "employee pension benefit plan" includes an agreement which "by its express terms or as a result of surrounding circumstances ... (i) provides retirement income to employees." 29 U.S.C. § 1002(2)(A)(i). Nash asserts that his agreement with BU comes within both definitions.

8. In ERISA, Congress enacted a comprehensive statutory framework designed to promote uniformity in the nationwide regulation of employee benefit plans. *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 54, 107 S.Ct. 1549, 1556, 95 L.Ed.2d 39 (1987). ERISA "supersede[s] any and all State laws insofar as they may now or hereafter relate to any employee benefit plan," 29 U.S.C. § 1144(a), and reflects an understanding that "[t]he policy choices reflected in the inclusion of certain remedies and the exclusion of others under the federal scheme would be completely undermined if ERISA-plan participants and beneficiaries were free to obtain remedies under state law that Congress rejected in ERISA." *Pilot Life*, 481 U.S. at 54, 107 S.Ct. at 1556. Thus, generally speaking, federal substantive law and not state law will govern a *claim for benefits* under ERISA. *See, e.g., Pilot Life, supra* (ERISA preempts state law claims for tortious breach of contract, breach of fiduciary duties, and fraud in the inducement arising from improper processing of a *claim* under a plan); *Cromwell v.*

As we have recognized, "Congress specifically contemplated that federal courts, *in the interests of justice,* would engage in interstitial lawmaking in ERISA cases *in much the same way as the courts fashioned a federal common law of labor relations under section 301 of [the Labor Management Relations Act]." Kwatcher,* 879 F.2d at 966 (emphasis added); *see Pilot Life,* 481 U.S. at 55–56, 107 S.Ct. at 1557–58 (discussing legislative history). The approach is to be a flexible one. As the Supreme Court observed regarding the development of federal common law under section 301 of the Labor Management Relations Act:

> [Some legal problems] will lie in the penumbra of express statutory mandates. Some will lack express statutory sanction but will be solved by looking at the policy of the legislation and fashioning a remedy that will effectuate that policy. The range of judicial inventiveness will be determined by the nature of the problem. Federal interpretation of the federal law will govern, not state law. But state law, if compatible with the purpose of § 301, may be resorted to in order to find the rule that will best effectuate the federal policy.

*Textile Workers Union v. Lincoln Mills of Alabama,* 353 U.S. 448, 457, 77 S.Ct. 912, 918, 1 L.Ed.2d 972 (1957) (citations omitted). *Accord Kwatcher,* 879 F.2d at 966 (1st Cir.1989) (applying *Lincoln Mills* to illustrate scope of federal common law under ERISA).

We begin by examining the statute itself. ERISA contains no explicit reference that could qualify as an "express statutory mandate" relating to fraud in the inducement. Nash nevertheless asserts that section 1053 of 29 U.S.C. indicates that Congress intended that benefits not be forfeitable "even upon a showing of misconduct by the covered employee." Section 1053(a) states that "[e]ach pension plan shall provide that an employee's right to his normal retirement benefit is nonforfeitable upon the attainment of normal retirement age...." As the quoted language indicates, however, section 1053 speaks to the nonforfeitability of employee benefits un-

der an *assumedly valid* ERISA plan. Nash offers no authority for the proposition that section 1053 entitles, let alone renders nonforfeitable, an employee benefit under an ERISA-related writing whose execution was induced by the claimant's fraud. The section 1053(a) cases Nash cites stand for the general proposition that pension fund benefits to which an employee is entitled may not be retained by the employer as security, or used as a setoff, where the employee-beneficiary's wrongdoing is unrelated to the formation of the ERISA plan. *See, e.g., Guidry v. Sheet Metal Workers Nat'l Pension Fund,* 493 U.S. 365, 110 S.Ct. 680, 107 L.Ed.2d 782 (1990) (employee convicted of embezzling union funds did not forfeit pension fund benefits); *Fremont v. McGraw–Edison Co.,* 606 F.2d 752 (7th Cir.1979) (employees' rights to profit-sharing and retirement trust nonforfeitable notwithstanding their theft of company property); *Winer v. Edison Bros. Stores Pension Plan,* 593 F.2d 307 (8th Cir.1979) (employee receiving kickbacks from employer's suppliers did not forfeit pension fund rights); *Vink v. SHV North America Holding Corp.,* 549 F.Supp. 268 (S.D.N.Y.1982) (same); *Flynn v. Savings & Profit–Sharing Plan for the Employees of Republic of Texas Corp.,* 558 F.Supp. 861 (N.D.Tex.1982) (employee convicted of misapplication of unrelated funds did not forfeit retirement and profit-sharing fund benefits). None of the cited cases dealt with fraud in the inducement of a putative employee benefit plan.

The legislative purpose and public policy activating ERISA would be advanced by accommodating the affirmative defense of fraud in the inducement within the developing reserve of federal common law. In enacting ERISA, Congress "repeatedly emphasized [its] purpose to protect *contractually defined benefits." Massachusetts Mut. Life Ins. Co. v. Russell,* 473 U.S. 134, 148, 105 S.Ct. 3085, 3093, 87 L.Ed.2d 96 (1985) (citing legislative history) (emphasis added). It is a settled principle of contract law that "wherever the circumstances are such as to warrant an action for deceit for inducing a person to enter into a contract,

they will certainly warrant avoidance or rescission of the bargain." 12 *Williston on Contracts* § 1487 (1970). We discern no sound reason that a failure to satisfy so central a contract principle, foreordaining the absence of any meaningful meeting of the minds, should not be considered a baseline element in any coherent body of federal common law developed under the congressional charter implicit in ERISA.

A contrary approach would bind a defrauded employer to the benefit bargain arrived at through the employee-beneficiary's fraud. As aptly stated in a somewhat different context, "[w]e are ... loath to think that Congress meant ... to institutionalize ... permitting employee-participants to sponge off an employer's good-faith bevues." *Kwatcher*, 879 F.2d at 966. Furthermore, since "[m]anifest inequity is one effective way of discouraging employers from sponsoring ERISA-qualified plans at all," *id.*, our refusal to recognize a right of rescission for fraud in the inducement would run counter to the important ERISA goal of "encouraging the formation of employee benefit plans." *Pilot Life*, 481 U.S. at 54, 107 S.Ct. at 1556.

The application of a traditional contract defense in an ERISA action is not unprecedented. In *Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 86–88, 102 S.Ct. 851, 861–62, 70 L.Ed.2d 833 (1982), the Supreme Court applied the defense of illegality to an ERISA claim in an action under 29 U.S.C. § 1145.[9] The ERISA plan trustees sought to compel employer contributions to the plan as called for under a collective bargaining agreement. The employer contended that the contributions required under the collective bargaining agreement would violate the Sherman Act and the National Labor Relations Act. The Supreme Court allowed an illegality defense, noting that an employer's obligation to contribute to an employee benefit plan is subject to other laws. In its allowance of the traditional contract defense in *Kaiser* the Court provided an analogue noteworthy in

the present case, by emphasizing that the employer's defense went to "the illegality of the very promise sought to be enforced." *Kaiser*, 455 U.S. at 88, 102 S.Ct. at 862.

Similarly, in *Rockney v. Blohorn*, 877 F.2d 637 (8th Cir.1989), the Eighth Circuit indicated its willingness to accommodate a traditional contract defense to the employee-plaintiffs' attempt to recover benefits under an unfunded ERISA plan, *see* 29 U.S.C. § 1132(a), by holding the individual officers of the employer corporation personally liable. The corporate officers defended on the ground that " 'employee benefit plans do not bind individual third parties who were not signatories to the agreements or who have not expressly accepted liability through some other form of endorsement, guarantee or express undertaking.' " *Rockney*, 877 F.2d at 643 (quoting district court ruling below). The district court had applied these "basic contract principles." *Id.* at 644. On appeal, the plaintiff-employees argued that the "contract defenses advanced by [corporate officers] should be rejected because ... ERISA preempts reliance upon contract defenses." *Id.* at 643. The Eighth Circuit expressly rejected the contention that recognition of basic contract principles would be contrary to the statute. *Id.* at 644. Stating that "requiring these defendants to make payments would be contrary to well established contract law principles," *id.*, the Eighth Circuit concluded that "[t]he defense that the person was not a party to or by his action bound by the terms of a contract is a valid defense to an action under ERISA for contributions from that person based on that contract." *Id.*

There is no clear indication in the language, structure, purpose or policy of ERISA, in its legislative history, or in the caselaw construing the statute, that Congress intended to eliminate the most elemental prerequisite to the formation of an enforceable contract—the meeting of the minds. Moreover, were we to conclude that so fundamental a principle as fraud in

---

**9.** Section 1145 states: "Every employer who is obligated to make contributions to a multiemployer plan under the terms of ... a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement." 29 U.S.C. § 1145.

the inducement may not be asserted in defense to a claim for the enforcement of a putative ERISA benefit plan, the congressional purpose in chartering federal court development of a body of ERISA-related federal common law would be diminished to insignificance. *See Pilot Life*, 481 U.S. at 56, 107 S.Ct. at 1557. We conclude that the Congress did not intend to preclude development of an ERISA-related body of federal common law incorporating traditional common law standards governing whether the formation of an alleged ERISA benefit plan was fraudulently induced by its would-be beneficiary.

■ The district court correctly ruled the early retirement agreement unenforceable under the Massachusetts common law doctrine of fraud in the inducement. Our research indicates that Massachusetts law regarding fraud in the inducement follows the widely-accepted model set forth in *Restatement (Second) of Contracts* § 164 (1979) ("If a party's manifestation of assent is induced by either a fraudulent or a material misrepresentation by the other party upon which the recipient is justified in relying the contract is voidable by the recipient"); *see Shaw's Supermarket, Inc. v. Delgiacco*, 410 Mass. 840, 575 N.E.2d 1115 (1991) (citing § 164 for proposition that a contract induced by fraud is voidable); *McEvoy Travel Bureau, Inc. v. Norton Co.*, 408 Mass. 704, 563 N.E.2d 188 (1990) (citing § 164). We find Massachusetts contract principles governing fraud in the inducement an appropriate model from which to fashion federal common law principles governing fraud in the inducement. Thus, the criteria employed by the district court comport with standards appropriate for application to ERISA-related agreements. *See Textile Workers*, 353 U.S. at 457, 77 S.Ct. at 918 (provisions of state law compatible with purposes of federal statute, may inform development of federal common law).

Accordingly, *the district court judgment is affirmed.*