TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-04-00713-CV






Carl L. Yeckel, Appellant


v.


Greg Abbott, Attorney General of the State of Texas 

and the Carl B. and Florence E. King Foundation, Appellees (1)






FROM THE PROBATE COURT NO. 1 OF TRAVIS COUNTY, 

NO. 77995-A, HONORABLE GUY S. HERMAN, JUDGE PRESIDING 




M E M O R A N D U M O P I N I O N



 Carl L. Yeckel appeals a probate court judgment, following a jury trial, declaring
void his purported employment benefits agreement with the Carl B. and Florence E. King
Foundation and awarding appellees over $5 million in equitable compensation and over $10 million
in punitive damages. In ten issues, Yeckel contends that federal preemption deprived the
probate court of subject-matter jurisdiction to void his agreement, challenges the legal and factual
sufficiency of the evidence supporting certain jury findings going to the validity of the agreement,
and argues that various other errors require reversal of the monetary awards. We will reverse the
punitive damages award and render judgment that appellees take nothing on that claim. We will
otherwise affirm the judgment.

BACKGROUND

 The underlying dispute concerns a Dallas-based, Texas non-profit corporation
and tax-exempt charitable private foundation, the Carl B. and Florence E. King Foundation
(the Foundation). See 26 U.S.C. § 501(c)(3) (West Supp. 2008). The Foundation was established
in 1966 by oilman Carl B. King and his wife, Florence E. King. Appellant Yeckel is the Kings'
grandson. Among other terms, the Foundation's bylaws state that it is organized exclusively for
charitable, educational, scientific and religious purposes; that the "business and affairs of the
corporation shall be vested exclusively in its Board of Directors, and the Board shall determine in
what manner the monies of the Foundation shall be spent"; that the Foundation's president, with the
board's prior approval, can execute contracts on the Foundation's behalf; and that the Foundation's
directors, officers, and employees "shall be entitled to such reasonable compensation as the Board
of Directors may from time to time determine."

 Yeckel was elected to the Foundation's board of directors in 1971. At the time,
Florence King was the board's president. Thereafter, in 1975, Yeckel accepted full-time
employment with the Foundation. The terms and conditions of his employment are at the center
of this dispute. Yeckel testified that other Foundation board members--who included both his
grandmother and aunt Dorothy King--recruited him to full-time employment with promises that
he "could expect an income which would be equivalent to that in the business world." A board
resolution reflects that Yeckel was initially hired for an annual salary of $24,000.

 Florence King died on September 9, 1983. Dorothy King, the Foundation's vice-president, became acting president until her election to that position in 1984. On September 26,
Dorothy King, purporting to act on the Foundation's behalf, and Yeckel executed a document,
titled "Agreement," that was attested by another Foundation board member, Jack C. Phipps. The
Agreement states that the "Foundation will employ Yeckel as an officer of the Foundation at such
rate of compensation as may be agreed upon." It further provides that "[i]t is contemplated that
such employment will continue until Yeckel reaches the age of 65 years," at which time it would
terminate and the Foundation would thereafter pay Yeckel "monthly an amount equal to 75% of
his 'average monthly compensation' during the 12 calendar months immediately preceding his
retirement, said payments to continue for his life." The Agreement contains similar provisions in
the event Yeckel became disabled, as well as provisions guaranteeing a pro-rated monthly payment
in the event Yeckel's employment terminated before he reached age 65. It was anticipated that these
payments were to be funded, in part, from the proceeds from three life insurance contracts purchased
by the Foundation and not from any contributions made by Yeckel. Yeckel testified that he did not
know whether the board had ever formally acted to approve the Agreement or authorize his aunt to
execute it on the Foundation's behalf. Nor were any corporate records introduced at trial reflecting
the board's authorization or approval.

 Yeckel was elected president of the Foundation in 1993. On October 6,1994, during
his first year as Foundation president, Yeckel sent a memorandum to the board proposing raises
for himself and the Foundation's two other employees, Thomas Vett, the corporate secretary
and accountant, and office staffer Carolyn Mott. In the memo, Yeckel advised the board that his
annual salary as of that date was $220,800, that Vett's salary was $120,700, and that Mott's salary
was $75,500. Yeckel proposed a four percent fixed salary increase for each employee--raising
his salary to $230,000, Vett's to $125,700, and Mott's to $78,750--plus "a possible merit scale of
0 - 4%," effective as of June 1, 1994. Yeckel further stated that the Foundation's practice had been
to increase or adjust salaries each April 1, and justified the raises he proposed as necessary to correct
a "twenty month oversight" in making those annual adjustments. He also cited intervening cost-of-living increases, a reduction in the number of Foundation employees from four to three "whilst
the actual volume of work has increased," growth in the Foundation's assets, and salary levels at
comparable foundations. (2) Yeckel's memo prompted at least one of the Foundation's board members
to raise concerns that the salary levels were high compared to comparable foundations--between
seventeen and sixty-five percent higher, the board member claimed--and could create problems with
the IRS. Similar concerns were raised by the accountant who prepared the Foundation's tax returns. 

 In the years that followed, Yeckel did not again disclose employee salaries to the
Foundation's board, although this information was included in the Foundation's annual tax returns. 
The jury heard evidence that Yeckel was able to set his own compensation and that of Vett and
Mott, without board approval, and that he steadily increased his compensation during each year
of his presidency. There was evidence that Yeckel increased his own salary between twenty and
twenty-six percent each year from 1996 through 2000, while awarding Vett annual increases of
between nineteen and twenty-two percent. By 2002, Yeckel's annual salary was $974,978, Vett's
was $451,937, and Mott's was $141,622, not counting benefits. The jury also heard evidence that
a separate bank account was established from which the salaries of Yeckel and Vett were paid, and
that no one other than Yeckel and Vett saw the checks written on that account. There was also
evidence that board members were unaware of the continued increases in Yeckel's compensation
after 1994 and of various benefits that Yeckel provided to himself using Foundation funds, including
use of vehicles, private club memberships, payment of all unreimbursed health expenses for himself
and his family, (3) and use of Foundation credit cards for personal charges that were not required to be
reimbursed. (4)

 During Yeckel's employment with the Foundation, its assets grew from $3 million
to about $37.6 million. (5) The jury heard evidence that, by 2002, a greater portion of the
Foundation's $5 million in expenses went to employees than to charitable beneficiaries: 
$1.03 million was distributed through donations, grants, and scholarships, while $2.6 million went
to human resource or personnel expenses. Additionally, the present value of retirement benefits that
Yeckel later claimed under the 1983 Agreement--including annual payment of seventy-five percent
of his highest annual salary--had a present value of approximately $10.5 million. Although the
1983 Agreement contemplated that these obligations would be funded with the proceeds of life
insurance policies, the cash value of the policies as of 2003 was only thirty-six percent of the amount
of the benefit obligations.

 In August 2002, after receiving a complaint from Yeckel's sister, the
Attorney General sued the Foundation, Yeckel, other directors, and Vett to protect the public interest
in the administration of charitable assets held by the Foundation. See Tex. Prop. Code Ann.
§§ 123.002-.005 (West 2007 & Supp. 2008). The suit asserted claims against the defendants for
breach of fiduciary duty, conversion, conspiracy to commit fraud, and violation of the Texas Non-Profit Corporation Act (NPCA). See Tex. Rev. Civ. Stat. Ann. arts. 1396-1.01-11.01 (West 2003
& Supp. 2008). Subsequently, Yeckel resigned from the King Foundation, each of the other
members of the five-member board either resigned or was removed, and Vett was terminated. With
a new board of directors in control, the Foundation asserted its own claims against Yeckel, the other
former directors, and Vett, and was realigned as a co-plaintiff with the Attorney General. As their
pleadings were later amended before trial, appellees sought actual and exemplary damages, equitable
disgorgement, and a declaration that the 1983 Agreement was void. The Attorney General also
sought attorney's fees. Yeckel counterclaimed, alleging that the 1983 Agreement entitled him to
monthly benefits equaling seventy-five percent of his salary during the twelve months immediately
preceding his "retirement," and sought monetary, declaratory and injunctive relief to enforce this
asserted obligation.

 After a two-week trial, the probate court submitted to the jury essentially two sets of
issues relevant to this appeal. One set of issues went solely to the validity of the 1983 Agreement: 



 whether the Agreement was authorized or approved by the Foundation's Board of Directors
prior to its execution (Question 4);

 if not, whether the Agreement was ratified by the Foundation's Board of Directors after its
execution (Question 5); 
 whether performing the Agreement would require the Foundation to pay Yeckel "any
compensation in excess of reasonable compensation for services rendered" (Question 7);

 whether performing the Agreement would "impair the King Foundation's ability to perform
its charitable public services" (Question 8);

 whether performing the Agreement would "compel the King Foundation to subordinate its
duties and obligations to Yeckel's private interests" (Question 9); and

 whether performing the Agreement would "injure the public good by rewarding Yeckel for
participating in fraudulent or illegal activity" (Question 10).




The jury failed to find that the 1983 Agreement had been authorized or ratified by the
Foundation board and found that performing the Agreement would require the Foundation to
pay Yeckel compensation in excess of reasonable compensation for services rendered, would
impair its ability to perform its charitable public services, would compel it to subordinate its
duties and obligations to Yeckel's private interests, and would "injure the public good by rewarding
Yeckel for participating in fraudulent or illegal activity." In light of these findings, the probate court
rendered judgment declaring void the 1983 Agreement and that Yeckel take nothing on his
counterclaims.

 The other set of issues submitted to the jury went to Yeckel's liability for his actions
before resigning from the Foundation. Question 1 inquired whether Yeckel, Vett, or three other
former directors had breached their fiduciary duties to the Foundation. Question 2 inquired whether
Yeckel or Vett had committed fraud against the Foundation. Question 3 inquired whether Yeckel
and/or Vett had "receive[d] any compensation from the King Foundation in excess of a reasonable
amount for services rendered." The jury was instructed in Question 3 that "compensation" meant
"salary, benefits, and any unreimbursed personal credit card charges paid on Yeckel's and Vett's
behalf for the years 1993 through 2002." Of relevance here, the jury found in the affirmative as to
Yeckel on all three issues.

 Predicated on an affirmative finding in Question 3 that Yeckel had received
compensation from the Foundation in excess of a reasonable amount for services rendered, the jury
was asked in Question 18 to determine the amount of his "reasonable salary" and "excess salary" for
each year between 1993 and 2002, as well as the total "excess salary" Yeckel had received during 
this period. The jury made findings as to each of these years and that Yeckel's total "excess salary"
for the period was $4,155,850.

 Predicated on an affirmative finding in Question 1 that Yeckel had breached his
fiduciary duties to the Foundation, Question 20 asked the jury to award the amount of damages 
proximately caused by his conduct, including excess salary paid to Yeckel and Vett, unreimbursed
personal credit card charges paid on behalf of Yeckel and Vett, and attorney's fees paid by the
Foundation for expenses incurred in the litigation by any of the Foundation's former officers
or directors. The jury awarded a total of $7,004,543, which included $4,155,850 in "excess salary"
paid to Yeckel (the same total amount of "excess salary" the jury found in Question 18), $130,909
in unreimbursed personal credit card expenses paid on Yeckel's behalf, and a lump sum of $653,351
in attorney's fees paid by the Foundation for its former officer and directors' litigation expenses. 
Question 21 then asked the jury to apportion fault among the defendants it had found in Question 1
to have breached their fiduciary duties. The jury found Yeckel fifty-five percent responsible.

 Predicated on affirmative findings in Questions 1 or 2, Question 22 asked the jury
to determine a reasonable fee for the necessary services of the Attorney General in the case. The jury
awarded $253,513.75 through trial, plus conditional appellate attorney's fees.

 Predicated on an affirmative finding in Question 1 that Yeckel and/or Vett had
breached his fiduciary duties to the Foundation, Question 23 submitted whether, as to Yeckel or Vett,
the jury found, "by clear and convincing evidence, that the harm to the King Foundation caused by
Defendants' misconduct resulted from malice." While finding in the affirmative as to Vett, the jury
failed to find that Yeckel had acted with malice.

 After the jury returned this verdict in the first phase of trial, it heard evidence
concerning the amount of punitive damages to be awarded. The probate court submitted, without
objection, the amount of punitive damages that should be assessed against not only Vett, but also
Yeckel. The jury awarded $10,500,000 against Yeckel.

 Appellees moved for judgment on the verdict. They requested that the probate court
award them the sum of $5,286,946.76 from Yeckel, representing equitable disgorgement or forfeiture
of (1) the amount of Yeckel's "excess salary" found by the jury in Question 18, (2) the amount of
unreimbursed personal credit card expenses that the jury attributed to Yeckel in Question 20, (3) the
portion of the attorney's fees sum the jury found in Question 20 that the evidence showed
the Foundation had incurred on Yeckel's behalf, (6) and (4) prejudgment interest on these amounts. 
The probate court rendered judgment awarding this amount. It also awarded the Attorney General
the attorney's fees the jury had found in Question 22. Additionally, over Yeckel's objection, the
probate court awarded appellees the punitive damages the jury had awarded in Question 23.

 Yeckel subsequently filed a motion for new trial, a request for findings of fact and
conclusions of law, and a notice of past due findings and conclusions. The probate court denied the
motion for new trial and did not enter the requested findings and conclusions. This appeal followed.


ANALYSIS

Judgment declaring 1983 Agreement void

 In his first issue, Yeckel argues that the probate court lacked jurisdiction to declare 
the 1983 Agreement void because the Agreement, coupled with his 1975 job offer from the
Foundation, constituted a benefit plan covered by the Employee Retirement Security Income Act
(ERISA). See 29 U.S.C. §§ 1001-1461 (West 2008 & 2009). He further reasons that appellees'
claims seeking to declare void the 1983 Agreement are preempted by ERISA and that such a
remedy lies within the exclusive subject-matter jurisdiction of the federal courts. See id. §§ 1109(a),
1132(e)(1), 1144(a) (West 2009); Shaw v. Delta Airlines, 463 U.S. 85, 91-93 (1983). According
to Yeckel, the probate court's only option was to enforce the 1983 Agreement. See 29 U.S.C.
§§ 1132(a)(1)(B) (granting state courts concurrent jurisdiction with federal courts to enforce
retirement benefits), 1144(c) (defining "state law" and "state"). Whether ERISA preemption applies
in this manner presents a question of law that we review de novo, see Egelhoff v. Egelhoff, 532 U.S.
141, 147 (2001), as does the question of the court's subject-matter jurisdiction generally. See Texas
Natural Res. Conservation Comm'n v. IT-Davy, 72 S.W.2d 849, 855 (Tex. 2002).

 Although state law claims are preempted if they involve an ERISA-covered
agreement's administration, such preemption does not extend to the threshold question of whether a
valid agreement existed in the first place. See Hobson v. Robinson, 75 Fed. Appx. 949, 952, 956
(5th Cir. 2003) (holding that state law claims for fraud and misrepresentation were not preempted
because challenged conduct occurred in inducement of ERISA-covered policy, not in its
administration). Because an ERISA-covered plan must be based on a valid contract, ERISA does
not preempt state law concerning contract formation:


ERISA supersedes all state laws relating "to any employee benefit plan," but not state
law contract principles whose violation would preclude the formation of any valid
contract in the first instance. In other words, section 1144(a) supersedes state law
provisions sought to be applied to a putative ERISA benefit plan, except insofar as
its formation failed to satisfy the generally applicable contract principles prerequisite
to the creation of any agreement. As no agreement of any kind would exist to which
ERISA could be considered applicable, the section 1144(a) preemption would not be
activated.



Nash v. Trustees of Boston Univ., 946 F.2d 960, 963 n.8 (1st Cir. 1991) (emphasis in original);
see Ram Tech. Servs. v. Koresko, No. 03-6163-AA, 2004 U.S. Dist. LEXIS 8688, at *12-13 (D. Or.
Apr. 15, 2004) (holding that existence of contract-formation defect "precludes the existence of
any 'plan' that might have been governed by ERISA"). In other words, if, under state law, no
agreement exists to which ERISA could apply, ERISA preemption is not implicated. Id. Similarly,
an agreement that is void under state law cannot be a plan covered by ERISA, even if it purports
to provide benefits that would otherwise be covered by ERISA. See, e.g., Bauer v. RBX Indus.,
368 F.3d 569, 582 (6th Cir. 2004); Nash, 946 F.2d at 965-66.

 Appellees' claims challenging the 1983 Agreement go to these threshold issues. 
These claims do not concern construction, interpretation, or administration of a benefit plan, but
whether the parties formed a valid agreement in the first place. See Hobson, 75 Fed. Appx. at 952,
956; see also Yeckel v. The Carl B. & Florence E. King Found. Retirement Pension Plan & Welfare
Benefit Program, No. 3:06-CV-0105-D, 2006 U.S. Dist. LEXIS 58854, at *18-19 (N.D. Tex. 2006)
(Fitzwater, J.) (observing, in a related proceeding Yeckel filed in federal court, that state courts have
concurrent subject-matter jurisdiction with federal courts to determine whether the 1983 Agreement
was an ERISA plan). Further, appellees brought these claims under state law, not ERISA, and
"[s]ection 1132 (e)(1) did not, therefore, vest the federal district courts with exclusive jurisdiction
over the claims." Yeckel, 2006 U.S. Dist. LEXIS, at *21-22. Consequently, the probate court
had subject-matter jurisdiction to adjudicate these claims and determine whether to declare the
1983 Agreement void. We overrule Yeckel's first issue.

 In his tenth issue, Yeckel asserts that the probate court erred by failing to enter post-trial findings of fact and conclusions of law regarding the bases for its rejection of his ERISA issues.
Yeckel's argument hinges on his contention that ERISA preempts appellees' claims and that "there
is no right to a jury determination of ERISA issues," which are "peculiarly reserved to the
trial judge." Having determined that the plaintiffs' claims challenging the 1983 Agreement are not
preempted by ERISA and are within the probate court's jurisdiction, we overrule Yeckel's
tenth issue.

 In his fourth through ninth issues, Yeckel challenges several of the jury findings
that underlie the probate court's legal conclusion that the 1983 Agreement is void. In his fifth and
sixth issues, Yeckel challenges the legal and factual sufficiency of the evidence supporting the jury's
failure to find that Dorothy King was authorized to execute the 1983 Agreement on the Foundation's
behalf (Question 4) or that the Foundation later ratified the Agreement (Question 5). In his seventh
and eight issues, Yeckel challenges the legal and factual sufficiency of the evidence supporting
the jury's findings that performing the 1983 Agreement would impair the Foundation's ability to
perform its charitable public services (Question 8), or would compel it to subordinate its duties
and obligations to Yeckel's private interests (Question 9). In his ninth issue, Yeckel complains only
of charge error in Question 10--whether performing the 1983 Agreement would "injure the public
good by rewarding Yeckel for participating in fraudulent or illegal activity"--on the basis that
"fraudulent or illegal activity" was not defined. Yeckel, however, does not challenge Question 7,
in which the jury found that performing the 1983 Agreement would have required the Foundation
to pay Yeckel compensation in excess of reasonable compensation for services rendered. 
Additionally, Yeckel failed to preserve his complaint of charge error in his ninth issue by failing
to raise it at trial, and we accordingly overrule it. See Tex. R. App. P. 33.1; Tex. R. Civ. P. 278;
State Dep't of Highways & Pub. Transp. v. Payne, 838 S.W.2d 235, 241 (Tex. 1992) (requiring
appellant to advise trial court of complaint timely and plainly). Either of these two findings can
support the probate court's judgment declaring the 1983 Agreement void.

 A contract that requires the Foundation to pay Yeckel compensation in excess of
reasonable compensation for services rendered is void as a matter of public policy. See Southwest
Livestock & Trucking v. Dooley, 884 S.W.2d 805, 809 (Tex. App.--San Antonio 1994, writ denied);
Blocker v. State, 718 S.W.2d 409, 415 (Tex. App.--Houston [1st Dist.] 1986, writ ref'd n.r.e.);
Texas Soc'y v. Fort Bend Chapter, 590 S.W.2d 156, 164 (Tex. Civ. App.--Texarkana 1979,
writ ref'd n.r.e.). In addition, a contract is void where its enforcement would "injure the public good
by rewarding Yeckel for participating in fraudulent or illegal activity." See Texas A & M Univ.
v. Lawson, 127 S.W.3d 866, 873 (Tex. App.--Austin 2004, pet. denied). As either of these findings
is sufficient to support the probate court's judgment that the 1983 Agreement is void, we need not
reach Yeckel's fifth, sixth, seventh, eighth and tenth issues. See Tex. R. App. P. 47.1.


Liability issues In his third issue, Yeckel complains of error in the form of the fraud question
(Question 2). Question 2 inquired:


Did Defendant[] Yeckel . . . commit fraud against the King Foundation? 


. . . 



FRAUD occurs when--



 a. A fiduciary, such as an officer or director of a non-profit charitable
corporation, fails to disclose a material fact within the knowledge of
the fiduciary;


 b. the fiduciary knows that the other party is ignorant of the fact and
does not have an equal opportunity to discover the truth; and


 c. the fiduciary intends to induce the other party to take some action by
failing to disclose the fact.Yeckel timely objected to the submission of Question 2 on the grounds that "it omits [the] essential
elements of . . . reliance and damage." (7) He brings this complaint forward in his third issue on appeal. 
In response, appellees assert that in a suit involving non-disclosure by a fiduciary who benefits
from a transaction with the beneficiary, reliance and injury should not be submitted to the jury
because they are presumed. This derives from the concepts, appellees explain, that a fiduciary
relationship is based on trust and that fiduciaries have a duty to disclose all material facts that
impact their beneficiaries. See Schlumberger Techn. Corp. v. Swanson, 959 S.W.2d 171, 181-82
(Tex. 1997); Thigpin v. Locke, 363 S.W.2d 247, 252 (Tex. 1962). Appellees also observe that
Question 2's omission of the reliance and injury elements tracks the pattern jury charge for a
fiduciary's fraud by nondisclosure. See Comm. on Pattern Jury Charges, State Bar of Tex.,
Texas Pattern Jury Charges: Business, Consumer, Insurance & Employment PJC § 105.4 & cmt.
(2003) ("Instruction on Common Law Fraud--Failure to Disclose When There is Duty to
Disclose"). (8) Section 105.4 of the PJC states that "reliance should not be submitted as an element
in a case involving failure to disclose by a fiduciary who profits or benefits in any way from a
transaction with the beneficiary." See id. (citing Schlumberger, 959 S.W.2d at 177-81).

 As long as the charge is legally correct, a trial judge is accorded broad discretion
regarding the submission of questions, definitions, and instructions to the jury. Hyundai Motor Co.
v. Rodriguez, 995 S.W.2d 661, 664 (Tex. 1999); cf. Ford Motor Co. v. Ledesma, 242 S.W.3d
32, 41 (Tex. 2007) (noting that charge that omitted indispensable element of proof was legally
incorrect). Legally correct definitions, instructions, and questions to the jury are reviewed for an
abuse of discretion. Roberson v. City of Austin, 157 S.W.3d 130, 135 (Tex. App.--Austin 2005,
pet. denied). Abuse of discretion will not be found unless the questions and definitions were
arbitrary, unreasonable, or without reference to guiding principles. Id. (citing Mercedes-Benz Credit
Corp. v. Rhyne, 925 S.W.2d 664, 666 (Tex. 1996); Ganesan v. Vallabhaneni, 96 S.W.3d 345, 350
(Tex. Civ. App.--Austin 2002, pet. denied)). We will not reverse unless we find that an error in the
jury charge caused an improper judgment to be rendered. Id. (citing Tex. R. App. P. 44.1(a)(1)).

 The Texas Supreme Court has held that fiduciaries have a duty to disclose material
facts within their knowledge to the beneficiary, and that, consequently, whether the beneficiary
relied upon the fiduciary to make the disclosure is "not a material inquiry." See Johnson v. Peckham,
120 S.W.2d 786, 788 (Tex. 1938) (holding that trial court did not err in refusing to submit special
issue to jury inquiring whether one partner relied on other partner to make disclosure about prior
negotiations for sale of property); cf. Schlumberger, 959 S.W.2d at 181 (distinguishing Johnson by
noting that there was "no evidence of a partnership or other confidential relationship between
Schlumberger and the Swansons"). Here, Yeckel was a fiduciary to the Foundation. Consequently,
it was not necessary for appellees to prove that the Foundation actually relied upon Yeckel to fulfill
his fiduciary obligation to disclose matters related to his compensation and was injured through that
reliance. Johnson, 120 S.W.2d at 788; see Schlumberger, 959 S.W.2d at 177-81. Based on these
supreme court decisions, we conclude that the probate court's instruction was legally correct and did
not constitute an abuse of discretion. We overrule Yeckel's third issue.

 Other than his issue with the form of Question 2, Yeckel does not challenge whether
the jury's fraud finding was sufficient to invoke the probate court's powers to impose the equitable
remedy of disgorgement or complain of any abuse of discretion in the disgorgement remedy that
was imposed. See Burrow v. Arce, 997 S.W.2d 229, 245-46 (Tex. 1999). Nor does Yeckel challenge
the probate court's attorney's fees award. Consequently, any error in the form of Question 1--the
breach-of-fiduciary-duty submission--would be harmless as it bears on these remedies. (9) 
Furthermore, for reasons explained below, the jury's finding in Question 1 is not a potential
predicate for the probate court's punitive damages award. We thus need not reach Yeckel's
fourth issue. See Tex. R. App. P. 47.1.


Punitive damages

 In his second issue, Yeckel contends that the probate court erred in imposing
punitive damages because the plaintiffs failed to obtain the predicate findings required by chapter 41
of the civil practice and remedies code. At relevant times, chapter 41 of the civil practice and
remedies code required, in pertinent part, that "exemplary damages may be awarded only if the
claimant proves by clear and convincing evidence that the harm with respect to which the claimant
seeks recovery of exemplary damages results from (1) fraud; or (2) malice." Act of Apr. 6, 1995,
74th Leg., R.S., ch. 19, § 1, 1995 Tex. Gen. Laws 108, 110, codified as amended, Tex. Civ. Prac.
& Rem. Code Ann. § 41.003(a) (West 2008); see also id. ("The claimant must prove by clear and
convincing evidence the elements of exemplary damages as provided by this section. This burden
of proof may not be shifted to the defendant or satisfied by evidence of ordinary negligence,
bad faith, or a deceptive trade practice."), codified as amended, Tex. Civ. Prac. & Rem. Code Ann.
§ 41.003(b). (10)

 Appellees first respond that "Yeckel's arguments reflect a fundamental
misunderstanding of the trial court's equitable power to award exemplary damages in intentional
breach of fiduciary duty cases." They rely on International Bankers Life Insurance Company
v. Holloway and its progeny for the proposition that punitive damages may be awarded in equity,
even in the absence of a finding or award of actual damages, where a trial court has imposed an
equitable remedy for an intentional breach of fiduciary duty. 368 S.W.2d 567, 583-84 (Tex. 1963);
see Manges v. Guerra, 673 S.W.2d 180, 184-85 (Tex. 1984); Cheek v. Humphreys, 800 S.W.2d 596,
599 (Tex. App.--Houston [14th Dist.] 1990, writ denied). Appellees further reason that in such
cases, trial courts have broad-ranging equitable discretion to impose punitive damages regardless
whether the plaintiff has obtained the jury findings required by chapter 41. However, the version
of chapter 41 applicable to this case plainly states otherwise.

 Effective September 1, 1995, the legislature mandated that chapter 41 "applie[d]
to any cause of action in which a claimant seeks exemplary damages relating to a cause of action." 
Act of Apr. 6, 1995, 74th Leg., R.S., ch. 19, § 1, 1995 Tex. Gen. Laws 108, 109, codified as
amended, Tex. Civ. Prac. & Rem. Code Ann. § 41.002(a) (West 2008). This language applies to any
cause of action seeking punitive damages, whether based in law or equity--including the ones
appellees assert. We must conclude that the legislature, through chapter 41, has limited whatever
equitable discretion the probate court could have possessed under the Holloway line of cases
to impose punitive damages. We are bound to give this language effect. See City of Rockwall
v. Hughes, 246 S.W.3d 621, 625-26 (Tex. 2008) (statutes are construed according to the plain
meaning of the text); State v. Shumake, 199 S.W.3d 279, 284 (Tex. 2006) (primary objective in
statutory construction is to give effect to legislature's intent based on statutory text). Consequently,
appellees cannot recover punitive damages unless they "prove[] by clear and convincing evidence
that the harm with respect to which the claimant seeks recovery of exemplary damages results from
(1) fraud; or (2) malice."

 As the party with the burden of proof on punitive damages, appellees had the burden
of obtaining favorable jury findings as to at least one of these two grounds for recovering
punitive damages. See Tex. R. Civ. P. 279; see also Fidelity Nat'l Title Ins. Co. v. Heart of Tex.
Title Co., No. 03-98-00473-CV, 2000 Tex. App. LEXIS 72, at *16 (Tex. App.--Austin 2000,
pet. denied) (not designated for publication) (observing that malice and fraud were "independent
grounds of recovery" of punitive damages for purposes of rule 279). Predicated on an affirmative
finding of breach-of-fiduciary duty in Question 1, Question 23 inquired:


 Do you find by clear and convincing evidence that the harm to the King
Foundation caused by Defendants' misconduct resulted from malice?

 

 "CLEAR AND CONVINCING EVIDENCE" means the measure or degree
of proof that produces a firm belief or conviction of the truth of the allegations
sought to be established.

 

 "MALICE" means:

 

 (a) a specific intent by the Defendant to cause substantial injury to the
King Foundation; or

 

 (b) an act or omission by the Defendant,

 

 (i) which, when viewed objectively from the standpoint of the
Defendant at the time of its occurrence, involved an extreme
degree of risk, considering the probability and magnitude of
the potential harm to others; and

 

 (ii) of which the Defendant had actual, subjective awareness of
the risk involved, but nevertheless proceeded with conscious
indifference to the rights, safety, or welfare of others.



With the exception of the phrase "caused by Defendant's misconduct," to which Yeckel did
not object, Question 23 tracked chapter 41 and the punitive damages predicate exemplar in the
Pattern Jury Charges. See Act of Apr. 6, 1995, 74th Leg., R.S., ch. 19, § 1, 1995 Tex. Gen. Laws
at 108, codified as amended, Tex. Civ. Prac. & Rem. Code Ann. § 41.001(7) (defining "clear
and convincing" and "malice"); Comm. On Pattern Jury Charges, State Bar of Tex., Texas Pattern
Jury Charges--Damages PJC § 110.33A (2003). As noted, the jury failed to find by clear-and-convincing evidence that Yeckel had acted with malice. 

 Appellees urge that the jury's affirmative finding in Question 2--the fraud liability
submission, quoted above--can support the judgment award of punitive damages. (11) Yeckel responds
that Question 2 did not submit fraud in a manner that can support punitive damages under chapter 41
because, unlike the malice submission in Question 23, it did not require the jury to find fraud
by clear-and-convincing evidence. Appellees, citing rule of civil procedure 278, counter that Yeckel
waived this complaint by failing to object to the absence of a clear-and-convincing evidence
instruction in Question 2 prior to its submission during the liability phase of trial. See Tex. R. Civ.
P. 278 ("Failure to submit a definition or instruction shall not be deemed a ground for reversal unless
a substantially correct definition or instruction has been requested in writing and tendered by the
party complaining of the judgment; provided, however, that objection to such failure shall suffice
in such respect if the question is one relied upon by the opposing party."). Although Yeckel raised
other objections to Question 2 prior to its submission, he did not complain about the absence of
a clear-and-convincing evidence instruction until after the verdict, when he objected to the
probate court's entry of a judgment awarding punitive damages on the basis that the predicate jury
findings required by chapter 41 were lacking.

 We disagree that Yeckel waived his complaint by failing to object to the absence of
a clear-and-convincing evidence instruction in Question 2 before its submission. From its wording
and placement in the charge, Question 2 appeared to submit only Yeckel's liability for fraud. There
is no defect in that submission, as we have previously explained. Nor is there anything in the
charge submitted during the liability phase that would give notice to Yeckel that Question 2 was
intended to be a predicate for punitive damages. To the contrary, the sole question in the charge
that corresponded to chapter 41's requirements was Question 23, which submitted only malice. 
Question 23 properly instructed the jury regarding the definition of malice under chapter 41 and the
clear-and-convincing standard of proof. The fact that Question 23 did not also submit fraud by clear-and-convincing evidence, or that this issue was not submitted through a separate question similar
to Question 23, would not signal a charge defect but a waiver of fraud as a ground for recovering
punitive damages.

 In these respects, this case is distinguishable from Green v. Allied Interests, Inc.,
963 S.W.2d 205, 210-11 (Tex. App.--Austin 1998, pet. denied). In Green, the plaintiff asserted
claims based on contract, promissory estoppel, and fraud theories, and sought punitive damages
based on the alleged fraud. As here, trial was bifurcated. During the liability phase, the district court
submitted a question inquiring whether, by a preponderance of the evidence, the defendants
had committed fraud. After the jury found fraud, the defendants objected to proceeding with the
punitive-damages phase of trial, arguing that the fraud finding could not support punitive damages
under chapter 41 because the finding had not been based on clear-and-convincing evidence. The
district court overruled this contention and ultimately awarded the punitive damages the jury found. 
Without extensive analysis, this Court, citing rule 278, held that the defendants had waived their
complaint by failing to object to the omission of a clear-and-convincing evidence instruction before
the fraud liability question was submitted during the first phase of trial. See id. However, in Green,
unlike here, fraud was the sole theory pled or submitted that conceivably could have supported
recovery of punitive damages under chapter 41. See id. 

 In the final alternative, appellees argue that Yeckel waived his complaint regarding
the use of Question 2 as a predicate for punitive damages by failing to object to the submission of 
a question during the second phase of trial inquiring as to the amount of punitive damages the jury
should award against him. (12) To the contrary, the jury's answer to this question is simply immaterial
in the absence of the findings chapter 41 requires before any such damages can be awarded. See
Oliver v. Oliver, 889 S.W.2d 271, 273-74 (Tex. 1994) (finding no waiver of error where jury's
answer to the submitted question is immaterial in light of an applicable statute). (13) We sustain
Yeckel's second issue.







CONCLUSION


 Having sustained Yeckel's second issue, we reverse the portion of the probate court's
judgment awarding punitive damages against him and render judgment that appellees take nothing
on that claim. However, because we have overruled Yeckel's other issues that are material to the
judgment, we affirm the probate court's judgment in all other respects.



 __________________________________________

 Bob Pemberton, Justice

Before Chief Justice Jones, Justices Puryear and Pemberton

Affirmed in part; Reversed and Rendered in part

Filed: June 4, 2009


1. This cause was reassigned to the present panel and author on April 27, 2009.
2. Yeckel further asserted, "Executive salaries among foundations is more an art than a
science when looking at the nature of the duties, expectations, background and experience,
knowledge of the business, time devoted, responsibilities, and overall contributions to the
organization and community."
3. These payments were in addition to health and disability insurance provided by
the Foundation.
4. When the Attorney General's investigation began, Yeckel made partial reimbursement to
the Foundation, based on the expenses that he could recall from memory.
5. This figure includes additional donations of $5 million from the estates of Florence and
Dorothy King.
6. As noted, Question 20 submitted only the total amount of attorney's fees that the
Foundation had incurred on behalf of its former officers and directors, which the jury found to be
$653,351. The jury was not asked to itemize the portion of this amount that the Foundation incurred
on behalf of each officer or director. For that information, appellees relied on Plaintiffs' Exhibit 118,
which indicated that the Foundation had paid $549,567.84 of the $653,351 total on Yeckel's behalf. 
7. Yeckel also objected that Question 2 "constitutes a comment on the weight of the
evidence." He does not press this contention on appeal.
8. See also Comm. on Pattern Jury Charges, State Bar of Tex., Texas Pattern Jury Charges:
Business, Consumer, Insurance & Employment PJC § 105.4 & cmt. (2006) (reflecting identical
instruction).
9. We also observe that any error in Question 1 as a basis for equitable disgorgement would
be harmless because Yeckel has not challenged the jury's finding in Question 3 that Yeckel received
compensation in excess of a reasonable amount for services rendered while President of the
Foundation. When a corporate officer or director diverts assets of the corporation to his own use, he
breaches a fiduciary duty of loyalty to the corporation. Southwest Livestock & Trucking v. Dooley,
884 S.W.2d 805, 809 (Tex. App.--San Antonio 1994, writ denied); Blocker v. State, 718 S.W.2d
409, 415 (Tex. App.--Houston [1st Dist.] 1986, writ ref'd n.r.e.); Texas Soc'y v. Fort Bend Chapter,
590 S.W.2d 156, 164 (Tex. Civ. App.--Texarkana 1979, writ ref'd n.r.e.). Accepting salary or
benefits in excess of a reasonable amount for services rendered is one means by which a corporate
officer or director may divest a corporation of assets. See, e.g., Lee v. Hersey, 223 S.W.3d 439, 447-48 (Tex. App.--Amarillo 2006, pet. denied) (setting out requirements for calculating damage to
corporate shareholder when shareholder is injured by payment of excess salary to corporation's
director). 
10. Chapter 41, as amended in the 1995 legislative session, applied to causes of action
accruing on or after September 1, 1995, and before the effective date of the 2003 amendments to the
statute in H.B. 4. See Act of Apr. 6, 1995, 74th Leg., R.S., ch. 19, § 2, 1995 Tex. Gen. Laws 108,
113; Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 13.04, 2003 Tex. Gen. Laws 847, 888 (effective
Sept. 1, 2003). Appellees have taken the position that their causes of action accrued no earlier than
September 2002, when a disinterested majority took control of the Foundation's board and "could
arguably have received notice of the facts establishing the Foundation's causes of action." Plaintiffs'
Trial Brief, CR 1348.
11. Because there are no instructions tying Question 2 to the jury's other liability findings,
appellees' argument would seem to require that the harm on which the punitive damage award is
based resulted from the fraud found in Question 2, see Act of Apr. 6, 1995, 74th Leg., R.S., ch. 19,
§ 2, 1995 Tex. Gen. Laws 108, 110, and that such fraud was also the basis for the probate court's
equitable disgorgement remedy. See Nabours v. Longview Sav. & Loan Assoc., 700 S.W.2d 901,
905 (Tex. 1985). 
12. Question 24 asked the jury to determine the amount of exemplary damages, if any, that
should be awarded against Yeckel. Question 25 asked the same question as to Vett. Both were
submitted without objection to the jury during the second phase of trial.
13. We note that appellees have not contended that the probate court's submission of the
amount of punitive damages can give rise to a deemed finding that, by clear-and-convincing
evidence, the harm with respect to which appellees seek recovery of punitive damages resulted from
fraud, or that the evidence is factually sufficient to support such a finding. See Tex. R. Civ. P. 279.