# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-04-00713-CV

**Carl L. Yeckel, Appellant**

v.

**Greg Abbott, Attorney General of the State of Texas
and the Carl B. and Florence E. King Foundation, Appellees[1]**

### FROM THE PROBATE COURT NO. 1 OF TRAVIS COUNTY,
### NO. 77995-A, HONORABLE GUY S. HERMAN, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Carl L. Yeckel appeals a probate court judgment, following a jury trial, declaring void his purported employment benefits agreement with the Carl B. and Florence E. King Foundation and awarding appellees over $5 million in equitable compensation and over $10 million in punitive damages. In ten issues, Yeckel contends that federal preemption deprived the probate court of subject-matter jurisdiction to void his agreement, challenges the legal and factual sufficiency of the evidence supporting certain jury findings going to the validity of the agreement, and argues that various other errors require reversal of the monetary awards. We will reverse the punitive damages award and render judgment that appellees take nothing on that claim. We will otherwise affirm the judgment.

---

[1] This cause was reassigned to the present panel and author on April 27, 2009.

**BACKGROUND**

The underlying dispute concerns a Dallas-based, Texas non-profit corporation and tax-exempt charitable private foundation, the Carl B. and Florence E. King Foundation (the Foundation). *See* 26 U.S.C. § 501(c)(3) (West Supp. 2008). The Foundation was established in 1966 by oilman Carl B. King and his wife, Florence E. King. Appellant Yeckel is the Kings' grandson. Among other terms, the Foundation's bylaws state that it is organized exclusively for charitable, educational, scientific and religious purposes; that the "business and affairs of the corporation shall be vested exclusively in its Board of Directors, and the Board shall determine in what manner the monies of the Foundation shall be spent"; that the Foundation's president, with the board's prior approval, can execute contracts on the Foundation's behalf; and that the Foundation's directors, officers, and employees "shall be entitled to such reasonable compensation as the Board of Directors may from time to time determine."

Yeckel was elected to the Foundation's board of directors in 1971. At the time, Florence King was the board's president. Thereafter, in 1975, Yeckel accepted full-time employment with the Foundation. The terms and conditions of his employment are at the center of this dispute. Yeckel testified that other Foundation board members—who included both his grandmother and aunt Dorothy King—recruited him to full-time employment with promises that he "could expect an income which would be equivalent to that in the business world." A board resolution reflects that Yeckel was initially hired for an annual salary of $24,000.

Florence King died on September 9, 1983. Dorothy King, the Foundation's vice-president, became acting president until her election to that position in 1984. On September 26,

2

Dorothy King, purporting to act on the Foundation's behalf, and Yeckel executed a document, titled "Agreement," that was attested by another Foundation board member, Jack C. Phipps. The Agreement states that the "Foundation will employ Yeckel as an officer of the Foundation at such rate of compensation as may be agreed upon." It further provides that "[i]t is contemplated that such employment will continue until Yeckel reaches the age of 65 years," at which time it would terminate and the Foundation would thereafter pay Yeckel "monthly an amount equal to 75% of his 'average monthly compensation' during the 12 calendar months immediately preceding his retirement, said payments to continue for his life." The Agreement contains similar provisions in the event Yeckel became disabled, as well as provisions guaranteeing a pro-rated monthly payment in the event Yeckel's employment terminated before he reached age 65. It was anticipated that these payments were to be funded, in part, from the proceeds from three life insurance contracts purchased by the Foundation and not from any contributions made by Yeckel. Yeckel testified that he did not know whether the board had ever formally acted to approve the Agreement or authorize his aunt to execute it on the Foundation's behalf. Nor were any corporate records introduced at trial reflecting the board's authorization or approval.

Yeckel was elected president of the Foundation in 1993. On October 6,1994, during his first year as Foundation president, Yeckel sent a memorandum to the board proposing raises for himself and the Foundation's two other employees, Thomas Vett, the corporate secretary and accountant, and office staffer Carolyn Mott. In the memo, Yeckel advised the board that his annual salary as of that date was $220,800, that Vett's salary was $120,700, and that Mott's salary was $75,500. Yeckel proposed a four percent fixed salary increase for each employee—raising

3

his salary to $230,000, Vett's to $125,700, and Mott's to $78,750—plus "a possible merit scale of 0 - 4%," effective as of June 1, 1994. Yeckel further stated that the Foundation's practice had been to increase or adjust salaries each April 1, and justified the raises he proposed as necessary to correct a "twenty month oversight" in making those annual adjustments. He also cited intervening cost-of-living increases, a reduction in the number of Foundation employees from four to three "whilst the actual volume of work has increased," growth in the Foundation's assets, and salary levels at comparable foundations.[2] Yeckel's memo prompted at least one of the Foundation's board members to raise concerns that the salary levels were high compared to comparable foundations—between seventeen and sixty-five percent higher, the board member claimed—and could create problems with the IRS. Similar concerns were raised by the accountant who prepared the Foundation's tax returns.

In the years that followed, Yeckel did not again disclose employee salaries to the Foundation's board, although this information was included in the Foundation's annual tax returns. The jury heard evidence that Yeckel was able to set his own compensation and that of Vett and Mott, without board approval, and that he steadily increased his compensation during each year of his presidency. There was evidence that Yeckel increased his own salary between twenty and twenty-six percent each year from 1996 through 2000, while awarding Vett annual increases of between nineteen and twenty-two percent. By 2002, Yeckel's annual salary was $974,978, Vett's was $451,937, and Mott's was $141,622, not counting benefits. The jury also heard evidence that

---

[2] Yeckel further asserted, "Executive salaries among foundations is more an art than a science when looking at the nature of the duties, expectations, background and experience, knowledge of the business, time devoted, responsibilities, and overall contributions to the organization and community."

a separate bank account was established from which the salaries of Yeckel and Vett were paid, and that no one other than Yeckel and Vett saw the checks written on that account. There was also evidence that board members were unaware of the continued increases in Yeckel's compensation after 1994 and of various benefits that Yeckel provided to himself using Foundation funds, including use of vehicles, private club memberships, payment of all unreimbursed health expenses for himself and his family,[3] and use of Foundation credit cards for personal charges that were not required to be reimbursed.[4]

During Yeckel's employment with the Foundation, its assets grew from $3 million to about $37.6 million.[5] The jury heard evidence that, by 2002, a greater portion of the Foundation's $5 million in expenses went to employees than to charitable beneficiaries: $1.03 million was distributed through donations, grants, and scholarships, while $2.6 million went to human resource or personnel expenses. Additionally, the present value of retirement benefits that Yeckel later claimed under the 1983 Agreement—including annual payment of seventy-five percent of his highest annual salary—had a present value of approximately $10.5 million. Although the 1983 Agreement contemplated that these obligations would be funded with the proceeds of life insurance policies, the cash value of the policies as of 2003 was only thirty-six percent of the amount of the benefit obligations.

---

[3] These payments were in addition to health and disability insurance provided by the Foundation.

[4] When the Attorney General's investigation began, Yeckel made partial reimbursement to the Foundation, based on the expenses that he could recall from memory.

[5] This figure includes additional donations of $5 million from the estates of Florence and Dorothy King.

In August 2002, after receiving a complaint from Yeckel's sister, the Attorney General sued the Foundation, Yeckel, other directors, and Vett to protect the public interest in the administration of charitable assets held by the Foundation. *See* Tex. Prop. Code Ann. §§ 123.002-.005 (West 2007 & Supp. 2008). The suit asserted claims against the defendants for breach of fiduciary duty, conversion, conspiracy to commit fraud, and violation of the Texas Non-Profit Corporation Act (NPCA). *See* Tex. Rev. Civ. Stat. Ann. arts. 1396-1.01-11.01 (West 2003 & Supp. 2008). Subsequently, Yeckel resigned from the King Foundation, each of the other members of the five-member board either resigned or was removed, and Vett was terminated. With a new board of directors in control, the Foundation asserted its own claims against Yeckel, the other former directors, and Vett, and was realigned as a co-plaintiff with the Attorney General. As their pleadings were later amended before trial, appellees sought actual and exemplary damages, equitable disgorgement, and a declaration that the 1983 Agreement was void. The Attorney General also sought attorney's fees. Yeckel counterclaimed, alleging that the 1983 Agreement entitled him to monthly benefits equaling seventy-five percent of his salary during the twelve months immediately preceding his "retirement," and sought monetary, declaratory and injunctive relief to enforce this asserted obligation.

After a two-week trial, the probate court submitted to the jury essentially two sets of issues relevant to this appeal. One set of issues went solely to the validity of the 1983 Agreement:

- whether the Agreement was authorized or approved by the Foundation's Board of Directors prior to its execution (Question 4);

- if not, whether the Agreement was ratified by the Foundation's Board of Directors after its execution (Question 5);

6

- whether performing the Agreement would require the Foundation to pay Yeckel "any compensation in excess of reasonable compensation for services rendered" (Question 7);

- whether performing the Agreement would "impair the King Foundation's ability to perform its charitable public services" (Question 8);

- whether performing the Agreement would "compel the King Foundation to subordinate its duties and obligations to Yeckel's private interests" (Question 9); and

- whether performing the Agreement would "injure the public good by rewarding Yeckel for participating in fraudulent or illegal activity" (Question 10).

The jury failed to find that the 1983 Agreement had been authorized or ratified by the Foundation board and found that performing the Agreement would require the Foundation to pay Yeckel compensation in excess of reasonable compensation for services rendered, would impair its ability to perform its charitable public services, would compel it to subordinate its duties and obligations to Yeckel's private interests, and would "injure the public good by rewarding Yeckel for participating in fraudulent or illegal activity." In light of these findings, the probate court rendered judgment declaring void the 1983 Agreement and that Yeckel take nothing on his counterclaims.

The other set of issues submitted to the jury went to Yeckel's liability for his actions before resigning from the Foundation. Question 1 inquired whether Yeckel, Vett, or three other former directors had breached their fiduciary duties to the Foundation. Question 2 inquired whether Yeckel or Vett had committed fraud against the Foundation. Question 3 inquired whether Yeckel and/or Vett had "receive[d] any compensation from the King Foundation in excess of a reasonable amount for services rendered." The jury was instructed in Question 3 that "compensation" meant "salary, benefits, and any unreimbursed personal credit card charges paid on Yeckel's and Vett's

7

behalf for the years 1993 through 2002." Of relevance here, the jury found in the affirmative as to Yeckel on all three issues.

Predicated on an affirmative finding in Question 3 that Yeckel had received compensation from the Foundation in excess of a reasonable amount for services rendered, the jury was asked in Question 18 to determine the amount of his "reasonable salary" and "excess salary" for each year between 1993 and 2002, as well as the total "excess salary" Yeckel had received during this period. The jury made findings as to each of these years and that Yeckel's total "excess salary" for the period was $4,155,850.

Predicated on an affirmative finding in Question 1 that Yeckel had breached his fiduciary duties to the Foundation, Question 20 asked the jury to award the amount of damages proximately caused by his conduct, including excess salary paid to Yeckel and Vett, unreimbursed personal credit card charges paid on behalf of Yeckel and Vett, and attorney's fees paid by the Foundation for expenses incurred in the litigation by any of the Foundation's former officers or directors. The jury awarded a total of $7,004,543, which included $4,155,850 in "excess salary" paid to Yeckel (the same total amount of "excess salary" the jury found in Question 18), $130,909 in unreimbursed personal credit card expenses paid on Yeckel's behalf, and a lump sum of $653,351 in attorney's fees paid by the Foundation for its former officer and directors' litigation expenses. Question 21 then asked the jury to apportion fault among the defendants it had found in Question 1 to have breached their fiduciary duties. The jury found Yeckel fifty-five percent responsible.

8

Predicated on affirmative findings in Questions 1 or 2, Question 22 asked the jury to determine a reasonable fee for the necessary services of the Attorney General in the case. The jury awarded $253,513.75 through trial, plus conditional appellate attorney's fees.

Predicated on an affirmative finding in Question 1 that Yeckel and/or Vett had breached his fiduciary duties to the Foundation, Question 23 submitted whether, as to Yeckel or Vett, the jury found, "by clear and convincing evidence, that the harm to the King Foundation caused by Defendants' misconduct resulted from malice." While finding in the affirmative as to Vett, the jury failed to find that Yeckel had acted with malice.

After the jury returned this verdict in the first phase of trial, it heard evidence concerning the amount of punitive damages to be awarded. The probate court submitted, without objection, the amount of punitive damages that should be assessed against not only Vett, but also Yeckel. The jury awarded $10,500,000 against Yeckel.

Appellees moved for judgment on the verdict. They requested that the probate court award them the sum of $5,286,946.76 from Yeckel, representing equitable disgorgement or forfeiture of (1) the amount of Yeckel's "excess salary" found by the jury in Question 18, (2) the amount of unreimbursed personal credit card expenses that the jury attributed to Yeckel in Question 20, (3) the portion of the attorney's fees sum the jury found in Question 20 that the evidence showed the Foundation had incurred on Yeckel's behalf,[6] and (4) prejudgment interest on these amounts.

---

[6] As noted, Question 20 submitted only the total amount of attorney's fees that the Foundation had incurred on behalf of its former officers and directors, which the jury found to be $653,351. The jury was not asked to itemize the portion of this amount that the Foundation incurred on behalf of each officer or director. For that information, appellees relied on Plaintiffs' Exhibit 118, which indicated that the Foundation had paid $549,567.84 of the $653,351 total on Yeckel's behalf.

The probate court rendered judgment awarding this amount. It also awarded the Attorney General the attorney's fees the jury had found in Question 22. Additionally, over Yeckel's objection, the probate court awarded appellees the punitive damages the jury had awarded in Question 23.

Yeckel subsequently filed a motion for new trial, a request for findings of fact and conclusions of law, and a notice of past due findings and conclusions. The probate court denied the motion for new trial and did not enter the requested findings and conclusions. This appeal followed.

## ANALYSIS

**Judgment declaring 1983 Agreement void**

In his first issue, Yeckel argues that the probate court lacked jurisdiction to declare the 1983 Agreement void because the Agreement, coupled with his 1975 job offer from the Foundation, constituted a benefit plan covered by the Employee Retirement Security Income Act (ERISA). *See* 29 U.S.C. §§ 1001-1461 (West 2008 & 2009). He further reasons that appellees' claims seeking to declare void the 1983 Agreement are preempted by ERISA and that such a remedy lies within the exclusive subject-matter jurisdiction of the federal courts. *See id*. §§ 1109(a), 1132(e)(1), 1144(a) (West 2009); *Shaw v. Delta Airlines*, 463 U.S. 85, 91-93 (1983). According to Yeckel, the probate court's only option was to enforce the 1983 Agreement. *See* 29 U.S.C. §§ 1132(a)(1)(B) (granting state courts concurrent jurisdiction with federal courts to enforce retirement benefits), 1144(c) (defining "state law" and "state"). Whether ERISA preemption applies in this manner presents a question of law that we review de novo, *see Egelhoff v. Egelhoff*, 532 U.S. 141, 147 (2001), as does the question of the court's subject-matter jurisdiction generally. *See Texas Natural Res. Conservation Comm'n v. IT-Davy*, 72 S.W.2d 849, 855 (Tex. 2002).

10

Although state law claims are preempted if they involve an ERISA-covered agreement's administration, such preemption does not extend to the threshold question of whether a valid agreement existed in the first place. *See Hobson v. Robinson*, 75 Fed. Appx. 949, 952, 956 (5th Cir. 2003) (holding that state law claims for fraud and misrepresentation were not preempted because challenged conduct occurred in inducement of ERISA-covered policy, not in its administration). Because an ERISA-covered plan must be based on a valid contract, ERISA does not preempt state law concerning contract formation:

> ERISA supersedes all state laws relating "to any employee benefit plan," but not state law contract principles whose violation would preclude the *formation* of any valid contract in the first instance. In other words, section 1144(a) supersedes state law provisions sought to be applied to a putative ERISA benefit plan, except insofar as its formation failed to satisfy the generally applicable contract principles prerequisite to the creation of any agreement. As no agreement of any kind would exist to which ERISA could be considered applicable, the section 1144(a) preemption would not be activated.

*Nash v. Trustees of Boston Univ.*, 946 F.2d 960, 963 n.8 (1st Cir. 1991) (emphasis in original); *see Ram Tech. Servs. v. Koresko*, No. 03-6163-AA, 2004 U.S. Dist. LEXIS 8688, at *12-13 (D. Or. Apr. 15, 2004) (holding that existence of contract-formation defect "precludes the existence of any 'plan' that might have been governed by ERISA"). In other words, if, under state law, no agreement exists to which ERISA could apply, ERISA preemption is not implicated. *Id*. Similarly, an agreement that is void under state law cannot be a plan covered by ERISA, even if it purports to provide benefits that would otherwise be covered by ERISA. *See, e.g.*, *Bauer v. RBX Indus.*, 368 F.3d 569, 582 (6th Cir. 2004); *Nash*, 946 F.2d at 965-66.

Appellees' claims challenging the 1983 Agreement go to these threshold issues. These claims do not concern construction, interpretation, or administration of a benefit plan, but whether the parties formed a valid agreement in the first place. *See Hobson*, 75 Fed. Appx. at 952, 956; *see also Yeckel v. The Carl B. & Florence E. King Found. Retirement Pension Plan & Welfare Benefit Program*, No. 3:06-CV-0105-D, 2006 U.S. Dist. LEXIS 58854, at *18-19 (N.D. Tex. 2006) (Fitzwater, J.) (observing, in a related proceeding Yeckel filed in federal court, that state courts have concurrent subject-matter jurisdiction with federal courts to determine whether the 1983 Agreement was an ERISA plan). Further, appellees brought these claims under state law, not ERISA, and "[s]ection 1132 (e)(1) did not, therefore, vest the federal district courts with exclusive jurisdiction over the claims." *Yeckel*, 2006 U.S. Dist. LEXIS, at *21-22. Consequently, the probate court had subject-matter jurisdiction to adjudicate these claims and determine whether to declare the 1983 Agreement void. We overrule Yeckel's first issue.

In his tenth issue, Yeckel asserts that the probate court erred by failing to enter post-trial findings of fact and conclusions of law regarding the bases for its rejection of his ERISA issues. Yeckel's argument hinges on his contention that ERISA preempts appellees' claims and that "there is no right to a jury determination of ERISA issues," which are "peculiarly reserved to the trial judge." Having determined that the plaintiffs' claims challenging the 1983 Agreement are not preempted by ERISA and are within the probate court's jurisdiction, we overrule Yeckel's tenth issue.

In his fourth through ninth issues, Yeckel challenges several of the jury findings that underlie the probate court's legal conclusion that the 1983 Agreement is void. In his fifth and

12

sixth issues, Yeckel challenges the legal and factual sufficiency of the evidence supporting the jury's failure to find that Dorothy King was authorized to execute the 1983 Agreement on the Foundation's behalf (Question 4) or that the Foundation later ratified the Agreement (Question 5). In his seventh and eight issues, Yeckel challenges the legal and factual sufficiency of the evidence supporting the jury's findings that performing the 1983 Agreement would impair the Foundation's ability to perform its charitable public services (Question 8), or would compel it to subordinate its duties and obligations to Yeckel's private interests (Question 9). In his ninth issue, Yeckel complains only of charge error in Question 10—whether performing the 1983 Agreement would "injure the public good by rewarding Yeckel for participating in fraudulent or illegal activity"—on the basis that "fraudulent or illegal activity" was not defined. Yeckel, however, does not challenge Question 7, in which the jury found that performing the 1983 Agreement would have required the Foundation to pay Yeckel compensation in excess of reasonable compensation for services rendered. Additionally, Yeckel failed to preserve his complaint of charge error in his ninth issue by failing to raise it at trial, and we accordingly overrule it. *See* Tex. R. App. P. 33.1; Tex. R. Civ. P. 278; *State Dep't of Highways & Pub. Transp. v. Payne*, 838 S.W.2d 235, 241 (Tex. 1992) (requiring appellant to advise trial court of complaint timely and plainly). Either of these two findings can support the probate court's judgment declaring the 1983 Agreement void.

A contract that requires the Foundation to pay Yeckel compensation in excess of reasonable compensation for services rendered is void as a matter of public policy. *See Southwest Livestock & Trucking v. Dooley*, 884 S.W.2d 805, 809 (Tex. App.—San Antonio 1994, writ denied); *Blocker v. State*, 718 S.W.2d 409, 415 (Tex. App.—Houston [1st Dist.] 1986, writ ref'd n.r.e.);

13

*Texas Soc'y v. Fort Bend Chapter*, 590 S.W.2d 156, 164 (Tex. Civ. App.—Texarkana 1979,

writ ref'd n.r.e.). In addition, a contract is void where its enforcement would "injure the public good

by rewarding Yeckel for participating in fraudulent or illegal activity." *See Texas A & M Univ.*

*v. Lawson*, 127 S.W.3d 866, 873 (Tex. App.—Austin 2004, pet. denied). As either of these findings

is sufficient to support the probate court's judgment that the 1983 Agreement is void, we need not

reach Yeckel's fifth, sixth, seventh, eighth and tenth issues. *See* Tex. R. App. P. 47.1.

**Liability issues**

In his third issue, Yeckel complains of error in the form of the fraud question

(Question 2). Question 2 inquired:

> Did Defendant[] Yeckel . . . commit fraud against the King Foundation?
>
> . . .
>
> FRAUD occurs when—
>
> a.    A fiduciary, such as an officer or director of a non-profit charitable corporation, fails to disclose a material fact within the knowledge of the fiduciary;
>
> b.    the fiduciary knows that the other party is ignorant of the fact and does not have an equal opportunity to discover the truth; and
>
> c.    the fiduciary intends to induce the other party to take some action by failing to disclose the fact.

14

Yeckel timely objected to the submission of Question 2 on the grounds that "it omits [the] essential elements of . . . reliance and damage."[7] He brings this complaint forward in his third issue on appeal. In response, appellees assert that in a suit involving non-disclosure by a fiduciary who benefits from a transaction with the beneficiary, reliance and injury should not be submitted to the jury because they are presumed. This derives from the concepts, appellees explain, that a fiduciary relationship is based on trust and that fiduciaries have a duty to disclose all material facts that impact their beneficiaries. *See Schlumberger Techn. Corp. v. Swanson*, 959 S.W.2d 171, 181-82 (Tex. 1997); *Thigpin v. Locke*, 363 S.W.2d 247, 252 (Tex. 1962). Appellees also observe that Question 2's omission of the reliance and injury elements tracks the pattern jury charge for a fiduciary's fraud by nondisclosure. *See* Comm. on Pattern Jury Charges, State Bar of Tex., Texas Pattern Jury Charges: Business, Consumer, Insurance & Employment PJC § 105.4 & cmt. (2003) ("Instruction on Common Law Fraud—Failure to Disclose When There is Duty to Disclose").[8] Section 105.4 of the PJC states that "reliance should not be submitted as an element in a case involving failure to disclose by a fiduciary who profits or benefits in any way from a transaction with the beneficiary." *See id.* (citing *Schlumberger*, 959 S.W.2d at 177-81).

As long as the charge is legally correct, a trial judge is accorded broad discretion regarding the submission of questions, definitions, and instructions to the jury. *Hyundai Motor Co. v. Rodriguez*, 995 S.W.2d 661, 664 (Tex. 1999); *cf. Ford Motor Co. v. Ledesma*, 242 S.W.3d

---

[7] Yeckel also objected that Question 2 "constitutes a comment on the weight of the evidence." He does not press this contention on appeal.

[8] *See also* Comm. on Pattern Jury Charges, State Bar of Tex., Texas Pattern Jury Charges: Business, Consumer, Insurance & Employment PJC § 105.4 & cmt. (2006) (reflecting identical instruction).

15

32, 41 (Tex. 2007) (noting that charge that omitted indispensable element of proof was legally incorrect). Legally correct definitions, instructions, and questions to the jury are reviewed for an abuse of discretion. *Roberson v. City of Austin*, 157 S.W.3d 130, 135 (Tex. App.—Austin 2005, pet. denied). Abuse of discretion will not be found unless the questions and definitions were arbitrary, unreasonable, or without reference to guiding principles. *Id.* (citing *Mercedes-Benz Credit Corp. v. Rhyne*, 925 S.W.2d 664, 666 (Tex. 1996); *Ganesan v. Vallabhaneni*, 96 S.W.3d 345, 350 (Tex. Civ. App.—Austin 2002, pet. denied)). We will not reverse unless we find that an error in the jury charge caused an improper judgment to be rendered. *Id.* (citing Tex. R. App. P. 44.1(a)(1)).

The Texas Supreme Court has held that fiduciaries have a duty to disclose material facts within their knowledge to the beneficiary, and that, consequently, whether the beneficiary relied upon the fiduciary to make the disclosure is "not a material inquiry." *See Johnson v. Peckham*, 120 S.W.2d 786, 788 (Tex. 1938) (holding that trial court did not err in refusing to submit special issue to jury inquiring whether one partner relied on other partner to make disclosure about prior negotiations for sale of property); *cf. Schlumberger*, 959 S.W.2d at 181 (distinguishing *Johnson* by noting that there was "no evidence of a partnership or other confidential relationship between Schlumberger and the Swansons"). Here, Yeckel was a fiduciary to the Foundation. Consequently, it was not necessary for appellees to prove that the Foundation actually relied upon Yeckel to fulfill his fiduciary obligation to disclose matters related to his compensation and was injured through that reliance. *Johnson*, 120 S.W.2d at 788; *see Schlumberger*, 959 S.W.2d at 177-81. Based on these supreme court decisions, we conclude that the probate court's instruction was legally correct and did not constitute an abuse of discretion. We overrule Yeckel's third issue.

16

Other than his issue with the form of Question 2, Yeckel does not challenge whether the jury's fraud finding was sufficient to invoke the probate court's powers to impose the equitable remedy of disgorgement or complain of any abuse of discretion in the disgorgement remedy that was imposed. *See Burrow v. Arce*, 997 S.W.2d 229, 245-46 (Tex. 1999). Nor does Yeckel challenge the probate court's attorney's fees award. Consequently, any error in the form of Question 1—the breach-of-fiduciary-duty submission—would be harmless as it bears on these remedies.[9] Furthermore, for reasons explained below, the jury's finding in Question 1 is not a potential predicate for the probate court's punitive damages award. We thus need not reach Yeckel's fourth issue. *See* Tex. R. App. P. 47.1.

**Punitive damages**

In his second issue, Yeckel contends that the probate court erred in imposing punitive damages because the plaintiffs failed to obtain the predicate findings required by chapter 41 of the civil practice and remedies code. At relevant times, chapter 41 of the civil practice and

---

[9] We also observe that any error in Question 1 as a basis for equitable disgorgement would be harmless because Yeckel has not challenged the jury's finding in Question 3 that Yeckel received compensation in excess of a reasonable amount for services rendered while President of the Foundation. When a corporate officer or director diverts assets of the corporation to his own use, he breaches a fiduciary duty of loyalty to the corporation. *Southwest Livestock & Trucking v. Dooley*, 884 S.W.2d 805, 809 (Tex. App.—San Antonio 1994, writ denied); *Blocker v. State*, 718 S.W.2d 409, 415 (Tex. App.—Houston [1st Dist.] 1986, writ ref'd n.r.e.); *Texas Soc'y v. Fort Bend Chapter*, 590 S.W.2d 156, 164 (Tex. Civ. App.—Texarkana 1979, writ ref'd n.r.e.). Accepting salary or benefits in excess of a reasonable amount for services rendered is one means by which a corporate officer or director may divest a corporation of assets. *See, e.g.*, *Lee v. Hersey*, 223 S.W.3d 439, 447-48 (Tex. App.—Amarillo 2006, pet. denied) (setting out requirements for calculating damage to corporate shareholder when shareholder is injured by payment of excess salary to corporation's director).

17

remedies code required, in pertinent part, that "exemplary damages may be awarded only if the claimant proves by clear and convincing evidence that the harm with respect to which the claimant seeks recovery of exemplary damages results from (1) fraud; or (2) malice." Act of Apr. 6, 1995, 74th Leg., R.S., ch. 19, § 1, 1995 Tex. Gen. Laws 108, 110, *codified as amended*, Tex. Civ. Prac. & Rem. Code Ann. § 41.003(a) (West 2008); *see also id.* ("The claimant must prove by clear and convincing evidence the elements of exemplary damages as provided by this section. This burden of proof may not be shifted to the defendant or satisfied by evidence of ordinary negligence, bad faith, or a deceptive trade practice."), *codified as amended*, Tex. Civ. Prac. & Rem. Code Ann. § 41.003(b).[10]

Appellees first respond that "Yeckel's arguments reflect a fundamental misunderstanding of the trial court's equitable power to award exemplary damages in intentional breach of fiduciary duty cases." They rely on *International Bankers Life Insurance Company v. Holloway* and its progeny for the proposition that punitive damages may be awarded in equity, even in the absence of a finding or award of actual damages, where a trial court has imposed an equitable remedy for an intentional breach of fiduciary duty. 368 S.W.2d 567, 583-84 (Tex. 1963); *see Manges v. Guerra*, 673 S.W.2d 180, 184-85 (Tex. 1984); *Cheek v. Humphreys*, 800 S.W.2d 596,

---

[10] Chapter 41, as amended in the 1995 legislative session, applied to causes of action accruing on or after September 1, 1995, and before the effective date of the 2003 amendments to the statute in H.B. 4. *See* Act of Apr. 6, 1995, 74th Leg., R.S., ch. 19, § 2, 1995 Tex. Gen. Laws 108, 113; Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 13.04, 2003 Tex. Gen. Laws 847, 888 (effective Sept. 1, 2003). Appellees have taken the position that their causes of action accrued no earlier than September 2002, when a disinterested majority took control of the Foundation's board and "could arguably have received notice of the facts establishing the Foundation's causes of action." Plaintiffs' Trial Brief, CR 1348.

18

599 (Tex. App.—Houston [14th Dist.] 1990, writ denied). Appellees further reason that in such cases, trial courts have broad-ranging equitable discretion to impose punitive damages regardless whether the plaintiff has obtained the jury findings required by chapter 41. However, the version of chapter 41 applicable to this case plainly states otherwise.

Effective September 1, 1995, the legislature mandated that chapter 41 "applie[d] to any cause of action in which a claimant seeks exemplary damages relating to a cause of action." Act of Apr. 6, 1995, 74th Leg., R.S., ch. 19, § 1, 1995 Tex. Gen. Laws 108, 109, *codified as amended*, Tex. Civ. Prac. & Rem. Code Ann. § 41.002(a) (West 2008). This language applies to any cause of action seeking punitive damages, whether based in law or equity—including the ones appellees assert. We must conclude that the legislature, through chapter 41, has limited whatever equitable discretion the probate court could have possessed under the *Holloway* line of cases to impose punitive damages. We are bound to give this language effect. *See City of Rockwall v. Hughes*, 246 S.W.3d 621, 625-26 (Tex. 2008) (statutes are construed according to the plain meaning of the text); *State v. Shumake*, 199 S.W.3d 279, 284 (Tex. 2006) (primary objective in statutory construction is to give effect to legislature's intent based on statutory text). Consequently, appellees cannot recover punitive damages unless they "prove[] by clear and convincing evidence that the harm with respect to which the claimant seeks recovery of exemplary damages results from (1) fraud; or (2) malice."

As the party with the burden of proof on punitive damages, appellees had the burden of obtaining favorable jury findings as to at least one of these two grounds for recovering punitive damages. *See* Tex. R. Civ. P. 279; *see also Fidelity Nat'l Title Ins. Co. v. Heart of Tex.*

19

*Title Co.*, No. 03-98-00473-CV, 2000 Tex. App. LEXIS 72, at \*16 (Tex. App.—Austin 2000, pet. denied) (not designated for publication) (observing that malice and fraud were "independent grounds of recovery" of punitive damages for purposes of rule 279). Predicated on an affirmative finding of breach-of-fiduciary duty in Question 1, Question 23 inquired:

> Do you find by clear and convincing evidence that the harm to the King Foundation caused by Defendants' misconduct resulted from malice?
>
> "CLEAR AND CONVINCING EVIDENCE" means the measure or degree of proof that produces a firm belief or conviction of the truth of the allegations sought to be established.
>
> "MALICE" means:
>
> (a)    a specific intent by the Defendant to cause substantial injury to the King Foundation; or
>
> (b)    an act or omission by the Defendant,
>
>> (i)    which, when viewed objectively from the standpoint of the Defendant at the time of its occurrence, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and
>>
>> (ii)    of which the Defendant had actual, subjective awareness of the risk involved, but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of others.

With the exception of the phrase "caused by Defendant's misconduct," to which Yeckel did not object, Question 23 tracked chapter 41 and the punitive damages predicate exemplar in the *Pattern Jury Charges*. *See* Act of Apr. 6, 1995, 74th Leg., R.S., ch. 19, § 1, 1995 Tex. Gen. Laws at 108, *codified as amended*, Tex. Civ. Prac. & Rem. Code Ann. § 41.001(7) (defining "clear and convincing" and "malice"); Comm. On Pattern Jury Charges, State Bar of Tex., Texas Pattern

Jury Charges—Damages PJC § 110.33A (2003). As noted, the jury failed to find by clear-and-convincing evidence that Yeckel had acted with malice.

Appellees urge that the jury's affirmative finding in Question 2—the fraud liability submission, quoted above—can support the judgment award of punitive damages.[11] Yeckel responds that Question 2 did not submit fraud in a manner that can support punitive damages under chapter 41 because, unlike the malice submission in Question 23, it did not require the jury to find fraud by clear-and-convincing evidence. Appellees, citing rule of civil procedure 278, counter that Yeckel waived this complaint by failing to object to the absence of a clear-and-convincing evidence instruction in Question 2 prior to its submission during the liability phase of trial. *See* Tex. R. Civ. P. 278 ("Failure to submit a definition or instruction shall not be deemed a ground for reversal unless a substantially correct definition or instruction has been requested in writing and tendered by the party complaining of the judgment; provided, however, that objection to such failure shall suffice in such respect if the question is one relied upon by the opposing party."). Although Yeckel raised other objections to Question 2 prior to its submission, he did not complain about the absence of a clear-and-convincing evidence instruction until after the verdict, when he objected to the probate court's entry of a judgment awarding punitive damages on the basis that the predicate jury findings required by chapter 41 were lacking.

---

[11] Because there are no instructions tying Question 2 to the jury's other liability findings, appellees' argument would seem to require that the harm on which the punitive damage award is based resulted from the fraud found in Question 2, *see* Act of Apr. 6, 1995, 74th Leg., R.S., ch. 19, § 2, 1995 Tex. Gen. Laws 108, 110, and that such fraud was also the basis for the probate court's equitable disgorgement remedy. *See Nabours v. Longview Sav. & Loan Assoc.*, 700 S.W.2d 901, 905 (Tex. 1985).

21

We disagree that Yeckel waived his complaint by failing to object to the absence of a clear-and-convincing evidence instruction in Question 2 before its submission. From its wording and placement in the charge, Question 2 appeared to submit only Yeckel's liability for fraud. There is no defect in that submission, as we have previously explained. Nor is there anything in the charge submitted during the liability phase that would give notice to Yeckel that Question 2 was intended to be a predicate for punitive damages. To the contrary, the sole question in the charge that corresponded to chapter 41's requirements was Question 23, which submitted only malice. Question 23 properly instructed the jury regarding the definition of malice under chapter 41 and the clear-and-convincing standard of proof. The fact that Question 23 did not also submit fraud by clear-and-convincing evidence, or that this issue was not submitted through a separate question similar to Question 23, would not signal a charge defect but a waiver of fraud as a ground for recovering punitive damages.

In these respects, this case is distinguishable from *Green v. Allied Interests, Inc.*, 963 S.W.2d 205, 210-11 (Tex. App.—Austin 1998, pet. denied). In *Green*, the plaintiff asserted claims based on contract, promissory estoppel, and fraud theories, and sought punitive damages based on the alleged fraud. As here, trial was bifurcated. During the liability phase, the district court submitted a question inquiring whether, by a preponderance of the evidence, the defendants had committed fraud. After the jury found fraud, the defendants objected to proceeding with the punitive-damages phase of trial, arguing that the fraud finding could not support punitive damages under chapter 41 because the finding had not been based on clear-and-convincing evidence. The district court overruled this contention and ultimately awarded the punitive damages the jury found.

22

Without extensive analysis, this Court, citing rule 278, held that the defendants had waived their complaint by failing to object to the omission of a clear-and-convincing evidence instruction before the fraud liability question was submitted during the first phase of trial. *See id.* However, in *Green*, unlike here, fraud was the sole theory pled or submitted that conceivably could have supported recovery of punitive damages under chapter 41. *See id.*

In the final alternative, appellees argue that Yeckel waived his complaint regarding the use of Question 2 as a predicate for punitive damages by failing to object to the submission of a question during the second phase of trial inquiring as to the amount of punitive damages the jury should award against him.[12] To the contrary, the jury's answer to this question is simply immaterial in the absence of the findings chapter 41 requires before any such damages can be awarded. *See Oliver v. Oliver*, 889 S.W.2d 271, 273-74 (Tex. 1994) (finding no waiver of error where jury's answer to the submitted question is immaterial in light of an applicable statute).[13] We sustain Yeckel's second issue.

---

[12] Question 24 asked the jury to determine the amount of exemplary damages, if any, that should be awarded against Yeckel. Question 25 asked the same question as to Vett. Both were submitted without objection to the jury during the second phase of trial.

[13] We note that appellees have not contended that the probate court's submission of the amount of punitive damages can give rise to a deemed finding that, by clear-and-convincing evidence, the harm with respect to which appellees seek recovery of punitive damages resulted from fraud, or that the evidence is factually sufficient to support such a finding. *See* Tex. R. Civ. P. 279.

## CONCLUSION

Having sustained Yeckel's second issue, we reverse the portion of the probate court's judgment awarding punitive damages against him and render judgment that appellees take nothing on that claim. However, because we have overruled Yeckel's other issues that are material to the judgment, we affirm the probate court's judgment in all other respects.

_____

Bob Pemberton, Justice

Before Chief Justice Jones, Justices Puryear and Pemberton

Affirmed in part; Reversed and Rendered in part

Filed:   June 4, 2009